UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

JEFFREY DOREUS,

                              **COMPLAINT**
               Plaintiff,    16-CV-2603

                              JURY TRIAL DEMANDED

        -against-

THE CITY OF NEW YORK, a municipal corporation;
POLICE OFFICER ANTOINE GILKES (Shield No. 9869),
POLICE OFFICER MATTHEW PALMIERI
(Shield No. 08390) & POLICE OFFICER JOHN DOE,
in their individual and official capacities,

                                        Defendants.
-------------------------------------------------------------------------X

    Plaintiff, Jeffrey Doreus, by his attorney, Ken Womble, alleges for his complaint against the defendants as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. §§ 1981, 1983 and 1988, the 4th, 5th and 14th Amendments to the United States Constitution for violations of his civil rights.

2.    On August 26, 2015, defendant officers illegally stopped and searched Plaintiff Doreus and his vehicle in the absence of reasonable suspicion and falsely arrested and unlawfully detained plaintiff Doreus, all without justification or due cause.

## JURISDICTION

3.    This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth and Fourteenth Amendments to the United States Constitution.

4.    Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

## VENUE

5. Venue is properly laid in the Eastern District of New York under 28 U.S.C. § 1391(b)(2), in that this is the District in which the events or omissions underlying the claim arose.

## JURY DEMAND

6. Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7. The plaintiff, an African American male, is and was at all relevant times a citizen of the City and State of New York.

8. Defendant, the City of New York, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

9. Defendant, the City of New York, maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, the City of New York.

10. At all times hereinafter mentioned, the individually named defendants, Police Officer Antoine Gilkes (Shield No. 9869) and Police Officer Matthew Palmieri (Shield No. 08390), were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

11. At all times hereinafter mentioned, the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official

rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

12. Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant City of New York.

13. Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by defendant City of New York.

**FACTS**

14. On August 26, 2015, at approximately 9:50 p.m., plaintiff Jeffrey Doreus was legally operating his 2011 BMW X6 vehicle in the vicinity of 1567 East 56th Street, Brooklyn, New York.

15. Plaintiff Doreus was taking his friend and passenger, Corey Corbett, home. Mr. Corbett's home address was 1509 East 56th Street, approximately 500 feet from where the defendant officers pulled Mr. Doreus over illegally and without cause.

16. The plaintiff was pulled over by defendant police officers even though he had violated no laws.

17. The defendant officers were in plainclothes and driving an unmarked police vehicle. The defendant officers were assigned to the Brooklyn South Anti-Crime Unit of the NYPD, a unit that is hardly tasked with making routine traffic stops.

18. The defendant officers approached plaintiff Doreus's vehicle and ordered him to roll his windows down, even his back windows. These demands from the defendant officers were hardly warranted for a routine traffic stop.

19. One of the defendant police officers approached plaintiff and requested plaintiff's driver license and registration. Plaintiff complied and provided defendant police officer with his valid driver's license and valid registration.

20. The defendant officers then began opening the back doors of plaintiff Doreus's vehicle while he and Mr. Corbett were seated in the vehicle and searched through plaintiff Doreus's vehicle without his consent or reasonable suspicion that a crime had been or was about to be committed. The defendant officers found nothing illegal during this search.

21. One of the defendant officers approached plaintiff Doreus and demanded that plaintiff Doreus tell defendant officer whose car it was. Plaintiff Doreus informed the defendant officer that it was plaintiff Doreus's vehicle. The same defendant officer continued to ask plaintiff Doreus whose car it was. The clear implication was that the defendant officers were suspicious of an African-American male operating a BMW in Brooklyn.

22. The defendant officers then ordered both plaintiff Doreus and Mr. Corbett out of the vehicle.

23. One of the defendant officers illegally frisked plaintiff Doreus, touching his genitals during the illegal search. The defendant officer found nothing illegal during this search.

24. Another defendant officer frisked Mr. Corbett. The defendant officer found nothing illegal during this search.

25. The defendant officers then continued their non-consensual and illegal search of plaintiff Doreus's vehicle. The defendant officers found nothing illegal during this search.

26. The defendant officers then told plaintiff Doreus and Mr. Corbett to get back into plaintiff Doreus's vehicle.

4

27. After a period of time, another police vehicle with additional police officers arrived.

28. Shortly after the arrival of the second police vehicle and additional police officers, one of the defendant officers ordered plaintiff Doreus out of the vehicle and placed plaintiff Doreus in handcuffs despite the fact that plaintiff Doreus had broken no laws and the defendant officers had found nothing illegal during their illegal frisk of plaintiff Doreus and Mr. Corbett and their illegal search of plaintiff Doreus's vehicle.

29. Plaintiff Doreus was then transported to the 63rd Precinct without any cause or justification.

30. Plaintiff Doreus was falsely charged by defendant officers with failing to use his turn signal even though he had used his turn signal prior to being pulled over by defendant officers.

31. Defendant officers also alleged that they recovered a "forged credit card" "in plainview [sic]" "underneath the driver's seat" of plaintiff Doreus's vehicle. Plaintiff Doreus did not possess such a card, nor was such a card present in plaintiff Doreus's vehicle. Defendant officers charged plaintiff Doreus with two counts relating to the alleged "forged credit card:" (1) forgery in the 3rd degree, which prohibits the falsely making, completing or altering a written instrument; and (2) forgery in the first degree (a C level felony), which further prohibits the false making, completing or altering of a written instrument that is "part of an issue of money, stamps, securities or other valuable instruments issued by a government or governmental instrumentality."

32. Plaintiff Doreus was unlawfully detained at the 63rd Precinct through the morning of August 27, 2015 (Arrest Number K15665636).

33. Plaintiff Doreus was eventually transported to Central Booking, where he was unlawfully detained until the evening of August 27, 2015.

34. Based upon the false information provided by the defendant officers, On August 27, 2015, after approximately 24 hours of unlawful detention, plaintiff Doreus was formally charged in Kings County Criminal Court with failing to use a turn signal and criminal possession of a forged instrument in the 3rd degree, a class A misdemeanor (Docket Number 2015KN056091). Plaintiff Doreus was released on his own recognizance.

35. During plaintiff Doreus's arraignment, he learned that the defendant officers falsely claimed that they "observed a strong odor of marihuana emanating from the motor vehicle" to justify their illegal search of plaintiff Doreus's vehicle and its occupants. No marijuana was ever found, nor was Mr. Doreus charged with driving while ability impaired by drugs, a violation of New York Vehicle and Traffic Law §1192.4, a class A misdemeanor.

36. The illegal arrest and unlawful detention caused plaintiff Doreus to miss an entire day of work. Additionally, plaintiff Doreus was assigned to "restricted duty" for a period of time as a result of this illegal arrest. Plaintiff Doreus was (and still is) an English teacher at Benjamin Banneker Academy in Brooklyn, New York.

37. The charges against plaintiff Doreus were dismissed and sealed on March 18, 2016.

38. The defendant officers, part of the Brooklyn South Anti-Crime Unit of the NYPD, did pull over plaintiff Doreus even though plaintiff Doreus had broken no law.

39. The defendant officers did illegally search both plaintiff Doreus and his passenger Mr. Corbett.

40. The defendant officers did illegally search plaintiff Doreus's vehicle, a BMW.

41. The defendant officers recovered nothing illegal during these unlawful searches.

42. Based upon the repeated questioning of Mr. Doreus as to the vehicle's true owner, it is clear that the defendant officers pulled plaintiff Doreus over because they were suspicious of an African American male driving a BMW.

43. The defendant officers created false allegations in order to falsely arrest and unlawfully detain plaintiff Doreus.

44. The defendant officers further made false representations, accusations and allegations against plaintiff Doreus to agents, servants and/or employees of the NYPD and the Kings County District Attorney's Office, and both such agencies acted on the representations of the defendant officers in initiating criminal proceedings against plaintiff Doreus.

45. Furthermore, at the time the defendant officers made such false representations, accusations and allegations, defendant officers knew that the Kings County District Attorney's Office would file criminal charges and prosecute plaintiff Doreus based upon those false representations, accusations and allegations.

46. The defendant officers knew that the allegations they communicated to the Kings County District Attorney's Office were false, but they communicated said allegations nonetheless, knowing that plaintiff would be subjected to a criminal prosecution and knowing that plaintiff Doreus's freedom and libery would be jeopardized and, if convicted upon the false charges, plaintiff Doreus could face incarceration and would obtain a criminal record. Additionally, due to his employment as a teacher with the New York City Department of Education, the defendant officers knew that forwarding these false allegations to the Kings County District Attorney's Office could potentially result in plaintiff Doreus being suspended and potentially terminated from his employment.

## **FIRST CAUSE OF ACTION**
*42 U.S.C. §§ 1981 & 1983 – Deprivation of Rights*
(Against the Individual Officer Defendants)

47. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "46" with the same force and effect as if fully set forth herein.

48. All of the aforementioned acts of defendant officers were carried out under the color of state law.

49. All of the aforementioned acts deprived plaintiff Doreus, a member of a racial minority, of the rights, privileges and immunities guaranteed to the citizens of the United States of America, and in violation of 42 U.S.C. §§ 1981 and 1983.

50. The acts complained of were carried out by the aforementioned defendant officers in the capacities as police officers, pursuant to the customs, usages, practices, procedures and the rules of the City of New York and the NYPD, all under the supervision of ranking officers of said department.

51. Defendant officers, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of this municipality/authority, which is forbidden by the Constitution of the United States.

52. Defendant officers violated the 4th and 14th Amendments because they stopped plaintiff Doreus because he was an African American male driving a BMW, and the defendant officers detained plaintiff Doreus based upon false allegations.

53. As a result, plaintiff sustained the damages alleged herein.

## **FIRST CAUSE OF ACTION**
*42 U.S.C. § 1983 - Fourth and Fourteenth Amendment Violations for Unlawful Stop*
(Against the Individual Officer Defendants)

54. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "53" with the same force and effect as if fully set forth herein.

55. Defendants violated the Fourth and Fourteenth Amendment because they stopped plaintiff without reasonable suspicion.

56. As a result, plaintiff sustained the damages alleged herein.

## SECOND CAUSE OF ACTION
*42 U.S.C. § 1983 - Fourth and Fourteenth Amendment Violations for False Arrest*
(Against the Individual Officer Defendants)

57. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "56" with the same force and effect as if fully set forth herein.

58. As a result of defendants' aforementioned conduct, plaintiff was subjected to an illegal, improper, and false arrest by the defendants. Plaintiff was taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings. In the above-mentioned actions, defendants acted intentionally, willfully, with malice, and without probable cause, privilege or consent.

59. Plaintiff was conscious of his confinement.

60. As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, plaintiff was put in fear for his safety, was humiliated and subjected to handcuffing, and other physical restraints, without probable cause.

## THIRD CAUSE OF ACTION
*42 U.S.C. § 1983- Fourth Amendment Violations for Failure to Intervene*
(Against the Individual Officer Defendants)

61. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "60" with the same force and effect as if fully set forth herein.

62. Defendant police officers who did not affect plaintiff's arrest, but observed the unlawful actions alleged herein, had an opportunity to prevent such conduct, and failed to intervene.

63. By virtue of the foregoing, the defendant police officer who failed to intervene deprived the plaintiff of his Fourth Amendment rights under the United States Constitution to be free from unreasonable searches of his person and is liable to plaintiff under 42 U.S.C. §1983

**FOURTH CAUSE OF ACTION**
*Monell* Claim/Municipal Liability
(Against Defendant City)

64. Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "1" through "63" with the same force and effect as if fully set forth herein.

65. The City's continuing failure to deter police misconduct has led to ever increasing numbers of lawsuits for repeated misconduct by the same officers, same units, and same precincts. In the fiscal year of 2012, there were 2,004 tort cases commenced against the New York City Police Department, up from 1,425 tort cases commenced for the fiscal year of 2008.[1] The City of New York paid approximately $500 million for torts against the New York City Police Department between 2009 and 2014[2], peaking in fiscal year of 2009 when it paid out more than $117 million.[1] In the past ten years, the City of New York has paid nearly a billion dollars on lawsuits brought against the NYPD.[3]

---

[1] Fiscal 2013 Preliminary Mayor's Management Report for the New York City Police Department, available at www.nyc.gov/html/ops/downloads/pdf/mmr0912/nypd.pdf, see page 5, last visited on July 6, 2015.

[2] http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html

[3] "NYPD gives quite the payday; AP report reveals police have dolled out $1B to resolve lawsuits," by Associated Press Writers Colleen Long and Jennifer Peltz via Daily News wire Report, http://www.nydailynews.com/new-york/nypd-payday-ap-report-reveals-police-dolled-1b-resolve-lawsuits-article-1.189671, October 15, 2010 last visited on January 27, 2014.

66. The widely held assumption is that civil rights lawsuits deter police misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, (1992) citing Carey v. Piphus, 435 U.S. 247, 254-257, (1978). "As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts." See Hudson v. Michigan 547 U.S. 586, 598 (2006) citing Correctional Services Corp. v. Malesko, 534 U.S. 61, 70 (2001) and Nix v. Williams, 467 U.S. 431, 446, (1984). "It is almost axiomatic that the threat of damages has a deterrent effect (citation omitted) surely particularly so when the individual official faces personal financial liability." Carlson v. Green, 446 U.S. 14, 21, (1980), citing Imbler v. Pachtman, 424 U.S. 409, 442, and footnote 6 (1976).

67. However, the City of New York has isolated NYPD officers like the defendant officers from accountability for civil rights lawsuits by indemnifying officers who violate the constitutional rights of citizens, and, as a result, is preventing civil rights lawsuits from having any deterrent value to the City, the NYPD or its officers. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the expense to the City of the officers' lawsuit liability, even after multiple lawsuits. In 1999, former Comptroller Alan Hevesi reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers.[4] This "total disconnect" between officers' liability and NYPD discipline, results in a system where the City pays vast sums to settle false

---

[4] Bob Hennelly's WNYC report, "Amid City Budget Crisis, New Scrutiny on Millions in NYPD Settlements" from June 8, 2011: http://www.wnyc.org/articles/its-free-country/2011/jun/08/amid-city-budget-grappling-new-scrutiny-millions-nypd-settlements/, last visited on January 27, 2014.

11

arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests or officers who have incurred large sums of civil rights liability.

68. The City Council, Government Operations Committee, despite being alerted at a City Council hearing on December 12, 2009, and on other occasions, to the obvious problem of officers and precincts with a disproportionate responsibility for civil rights lawsuit liability, has failed to take action to hold officers or precincts accountable. It has likewise failed to hold an investigative hearing into what extent specific officers, units and precincts are disproportionately responsible for New York City civil rights lawsuits.

69. The Brooklyn South Division of the NYPD is currently embroiled in a scandal involving its Deputy Chief Eric Rodriguez, who is currently the target of an FBI investigation into corruption and was recently removed from his post by Commissioner Bratton. Brooklyn South officers, especially those in the plainclothes Anti-Crime Unit, have a long track record of civil rights violations coupled with an impossibly short record of accountability. In addition to prior complaints and lawsuits, the City has been aware for some time, from lawsuits, notices of claim, complaints filed with the toothless Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a significant number of their police officers from the Brooklyn South Division unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

70. The defendant officers in this case engaged in a practice so prevalent that it has found its way into our lexicon. The NYPD has, for quite some time, pulled over law-abiding motorists whose only "crime" is DWB, or "Driving While Black." Officers of the NYPD, especially those of the clandestine Anti-Crime Units, stop African-American motorists based

upon pretext of some minor traffic violations and then inevitably create a pretext basis for an illegal search of the vehicle. When these practices result in the discovery of illegal contraband, the allegations that form the basis for the search are often detached from reality and formed to fit Constitutional rules and requirements. When illegal contraband is not recovered, as was the case with plaintiff Doreus, officers will create charges to justify an arrest. The motivation for the officers is to meet quotas or obtain overtime by staying late in order to process the arrest. Presently, the only deterrence for these illegal actions are lawsuits like the present one, as the NYPD is notorious for its failure to hold its officers accountable for illegal conduct and dishonesty.

71. Notwithstanding the NYPD's reputation, the City has repeatedly resisted attempts to catalog even basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. The City's deliberate indifference towards the contents of civil rights litigation, individual officers repeatedly named in lawsuits, incidents repeatedly occurring in the same division, and patterns of misconduct that arise in civil rights litigation has caused the constitutional violations of excessive force and false arrest suffered by plaintiff.

72. Further, the City has no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct or to calculate the total liability of an individual officer or of a precinct. Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for. Even occasional judicial findings that officers have testified incredibly are not reported routinely to the police department or any oversight agencies.

73. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. "Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged." See Colon v. City of New York, et al, 2009 WL 4263362 (E.D.N.Y.) (Weinstein, J.).

74. In Floyd v. City of New York, 08-cv-01034-SAS-HBP, Judge Scheindlin found that the City acted with "deliberate indifference toward the NYPD's practice of making unconstitutional stops and conducting unconstitutional frisks" and adopted "a policy of indirect racial profiling by targeting racially defined groups for stops based on local crime suspect data." (Opinion and Order, dated August 12, 2013, P.13).

75. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate plaintiffs' civil rights, without fear of reprisal.

76. Plaintiff has been damaged as a result of the deliberate indifference of the Defendant City.

WHEREFORE, plaintiff demands a jury trial and the following relief jointly and severally against the defendants:

    a.    Compensatory damages in an amount to be determined by a jury;

    b.    Punitive damages in an amount to be determined by a jury;

    c.    Costs, interest and attorney's fees, pursuant to 42 U.S.C. §1988; and

    d.    Such other and further relief as this Court may deem just and proper, including injunctive and declaratory relief.

Dated: New York, New York
May 19, 2016

By:    Ken Womble

*/s/ AKW*

_____

Ken Womble
Attorney for Plaintiff Doreus
Moore Zeman Womble, LLP
    66 Willoughby St.
Brooklyn, New York 11201
(T) (718) 514-9100
(F) (917) 210-3700
womble@brooklynattorney.nyc

15